# IN THE COURT OF APPEALS

# OF THE

# STATE OF MISSISSIPPI

## NO. 98-CA-00531-COA

**IN THE MATTER OF THE LAST WILL AND TESTAMENT OF CLARICE TEMPLE CARNEY, DECEASED: DARNELL C. ADAMS**      **APPELLANT**

**v.**

**P. TEMPLE CARNEY, A. P. CARNEY, III, JOHN LACK CARNEY, JESSICA CARNEY, AND DAWN CARNEY**      **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/02/1998 |
| TRIAL JUDGE: | HON. SARAH P. SPRINGER |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES T. KNIGHT |
| | C. TED SANDERSON |
| | MICHELLE C. PARTRIDGE |
| ATTORNEYS FOR APPELLEES: | IRVIN LEROY MARTIN JR. |
| | ROBERT ALVIN WEEMS |
| | E. GREGORY SNOWDEN |
| | DEIDRA D. JONES |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| TRIAL COURT DISPOSITION: | JUDGMENT ENTERED IN FAVOR OF APPELLEES |
| DISPOSITION: | AFFIRMED - 6/8/99 |
| MOTION FOR REHEARING FILED: | 7/13/99; denied 09/28/99 |
| CERTIORARI FILED: | 10/13/99; granted 01/06/2000 |
| MANDATE ISSUED: | |

BEFORE McMILLIN, C.J., IRVING, AND PAYNE, JJ.

McMILLIN, C.J., FOR THE COURT:

¶1. This case arises out of the chancellor's decision regarding the testamentary effect to be given five separate writings (two of which were executed at different times on the same sheet of paper) in the hand of Clarice Temple Carney, now deceased. Four of the writings were discovered after Carney's death to be in

her possession. The other writing had been in the possession of Carney's daughter since 1978. The chancellor, in a lengthy and thoughtful opinion, determined that all of the writings were testamentary in character. She additionally found that the bequests contained in the earliest writing, which was the one in the daughter's possession, had been revoked by implication by one of the later writings. She then held that the remaining writings were capable of being construed together to constitute a complete disposition of Carney's entire estate. That decision resulted in the daughter receiving a substantially diminished portion of Carney's estate than would have been the case had her theory of the instruments been upheld.

¶2. That decision prompted an appeal by the daughter raising five issues. The issues presented in this appeal all relate to matters of will construction and not to the more fundamental question of whether these various writings were, in fact, testamentary writings subject to being admitted to probate. No party to this appeal disputes the chancellor's conclusion that the various writings were holographic instruments, wholly written in the decedent's hand, signed by her, and intended to devise assets of her estate on her death.

¶3. We do not find manifest error in the chancellor's conclusions regarding the construction of the various writings as an expression of the wishes and desires of the decedent as to the disposition of her estate. Therefore, we affirm.

## I.

### Facts

¶4. For purposes of our consideration, the facts may be briefly stated. Clarice Temple Carney had three sons, P. Temple Carney, A.P. Carney III, and John Carney. She also had one daughter, Darnell Carney Adams. John Carney predeceased his mother and left a widow, Dawn Carney and two children, Jessica Carney and John Lack Carney. Carney, in 1978, wrote, dated and signed a writing that appeared to serve a dual purpose. It appointed her daughter, Darnell Adams, as her attorney in fact in the event she became incapacitated. The writing was, according to the chancellor's interpretation, also testamentary in character and bequeathed to the daughter all of Carney's personal property. Adams took possession of that instrument at the time it was written and kept it in a bank safety deposit box until after Carney's death.

¶5. On June 29, 1992, Carney wrote another document that conveyed her homeplace and contents, less any jewelry found therein, to Dawn Carney, the widow of her deceased son. She devised another piece of commercial real property, referred to as "Mississippi Industries for the Blind," to her son A.P. Carney III. The writing then contained an itemization of various bank or investment accounts totaling approximately $560,000. After that listing, there was the following entry:

> I am holding a mortgage on home app $73,000 interest 10% flat rate at 182 - Ocean Wave Ave Long Beach Miss 39560. I own one fourth of the A.P. Carney Sr Estate. It's income is approximately $8,000 per year paid sim [sic] anually Jan and July.

> No court or lawyers are needed as there are no leans [sic] except Dixie Stockyard.

> The remainder of this estate is to be divided into three parts: To John Carney, my son, deceased, to his heirs Jessica and John Lack Carney. This is to be held in trust for them until they are thirty-five years old. They shall receive interest.

> To Pomp Temple Carney, A. P. Carney III to share alike including jewelry and other items and car.

¶6. On December 27, 1994, Carney lined through the language devising the Mississippi Industries for the Blind property to A.P. Carney III, writing "void" near the paragraph and inserting the date as "12/27/94." Earlier that year, on January 27, 1994, she wrote, dated and signed another instrument that bore some similarity to the 1992 writing. Both, for instance, opened with the phrase, "Being of sound mind and body I hereby bequeath my worldly goods as follows." Both began with a devise of the homeplace and followed that with a devise of the Mississippi Industries for the Blind property. Both then had what appears to be an itemization of certain remaining assets, primarily investment accounts totaling rather large sums of money. Both contain statements indicating the testatrix's view that no lawyers or legal proceedings would be needed to give effect to the will. However, at that point the similarity between the two instruments ends. While the 1992 instrument concludes with the clause quoted above, the 1994 writing stops abruptly after the itemization of the bank and investment accounts and the testatrix's expressed aversion to courts and attorneys.

¶7. On April 3, 1995, Carney made the following entry on the paper containing the 1992 writing:

> I appoint my son P. Temple Carney to see that this will is properly executed I name P. Temple Carney as executor of the estate. Anyone of these heirs who cares to hire a lawyer to see that this will is executed forfeits his inheritance.

¶8. Additionally, on April 3, 1995, Carney wrote, dated and signed a separate writing that said, "I leave my daughter Darnell the sum of $10,000, and the church ring I wear on my left hand."

¶9. The chancellor, as we have already mentioned, found all documents to be valid holographic instruments possessing testamentary character within the meaning of Section 91-5-1 of the Mississippi Code. She further found that the 1992 writing was a comprehensive testamentary instrument devising and bequeathing in its various parts all of the testatrix's assets. Therefore, the chancellor concluded that this instrument, by making dispositions of assets covered in the 1978 instrument that were substantially in conflict with those earlier bequests, had the effect of revoking the earlier writing by necessary implication.

¶10. The chancellor further found that the 1994 writing, by virtue of its silence on the matter of the disposition of substantial personal property, including the itemized bank and investment accounts, was not intended to impliedly revoke the 1992 writing in its entirety. Rather, the chancellor concluded, the instrument was more properly seen as a codicil to the 1992 writing intended only to change the disposition of the homeplace and the "Mississippi Industries for the Blind" property and nothing more. Thus, the remaining provisions of the 1992 writing not specifically overridden by the terms of the 1994 writing remained in effect, according to the chancellor.

¶11. The chancellor also concluded that the supplemental writing in 1995, which appeared on the same sheet as the 1992 instrument, was a valid codicil insofar as it named an executor, but that the provisions regarding forfeiture for anyone mentioned who "cares to hire a lawyer to see that this will is executed" was not capable of a reasonable construction, based on the evidence before her, to ascertain what the decedent actually meant by the provision.

¶12. Lastly, she found that the separate 1995 writing served as a valid bequest to Darnell Adams of $10,000 in cash from the estate and the church ring that Carney wore on her left hand. However, since that was the only mention of the daughter, Darnell Adams, in any writings still in effect at the decedent's death, the chancellor concluded that this sum of money and the ring would be all Adams would take from her mother's

estate.

¶13. Adams actually advances two alternate theories as to the proper construction of these various writings, either of which would significantly increase her share of the estate if adopted. First, she suggests that the 1978 document, conveying all of her mother's personal property to her, was never affirmatively revoked by Carney prior to her death, and the provisions of the 1992 writing that mentioned personalty was nothing more than a residuary clause intended to dispose only of those items not previously bequeathed in a more specific manner. Such a general "catch-all" clause does not, according to Adams's argument, convey with the necessary clarity the testatrix's intent to cancel the previously-accomplished very specific bequests of the 1978 instrument. Therefore, the chancellor abused her discretion in applying the doctrine of revocation by necessary implication to find the 1978 instrument to be of no effect.

¶14. Alternatively, Adams argues that the 1994 writing was so contrary, in all material particulars, to the 1992 instrument that the chancellor should have applied the doctrine of revocation by necessary implication to it and concluded that the 1992 instrument was revoked as to all aspects and not just in part. The effect of that interpretation would be to either revive the 1978 writing or to render Carney partially intestate because the 1994 writing made no disposition of the personalty and certain other assets. As to those assets, Adams's alternate argument runs, she would be entitled to all of them under the 1978 writing or, at a minimum, a child's part under the laws of intestate succession.

¶15. With this factual background in mind, we will now consider the specific issues raised by Adams in her appeal, keeping in mind that the ultimate aim of such an endeavor is not to make an equitable distribution of the decedent's estate, but is, insofar as possible, to determine the intention of the testator. *Estate of Dedeaux v. Dedeaux,* 584 So. 2d 419, 421 (Miss. 1991).

## II.

### The First Issue: Did the 1992 Writing Revoke the 1978 Writing?

¶16. Adams correctly points out the standard for deciding whether a subsequent testamentary writing revokes a prior will by necessary implication by citing the Court to the case of *Estate of Crawford v. Crawford,* 225 Miss. 208, 82 So. 2d 823 (1955). In that case, the Mississippi Supreme Court said:

> From what has been said above, it seems clear that a second will, perfect in form and duly executed, which makes a different disposition of the testator's entire estate from that made by the prior will, may be set up as a revocation of the prior will, although there is no express clause of revocation in the second will . . . .

*Id.* at 226, 82 So. 2d at 830.

¶17. In the case before us, we are faced with one instrument dated in 1978, which appears to make a disposition of the testatrix's personalty to her daughter and which fails to mention at all the testatrix's real estate. We are confronted with the proposition that this instrument, because of its dual purpose as a power of attorney in the event of the testatrix's incapacity during her lifetime, remained in the sole possession of the beneficiary from the time of its execution through the testatrix's death. We further observe that the second testamentary instrument executed by the testatrix was done in 1992, some fourteen years after the earlier instrument, and we note that the 1992 document begins with the proposition, stated in the testatrix's own words and not the boiler-plate language of an attorney's form book, that the instrument is intended to

dispose of "my worldly goods" without any words of limitation or reservation. The 1992 instrument then proceeds to make a rather detailed listing of the testatrix's assets, including an itemization of personalty that would otherwise be covered in the 1978 writing. It twice specifically mentions "jewelry," which reference does not except the numerous itemized pieces of jewelry mentioned in the 1978 instrument, and makes a bequest of the jewelry to someone other than the daughter. In a similar vein, it would appear that the clause of the 1992 writing that follows this itemization of numerous assets, including investment accounts, can be seen as something different from simply a "catch all" residuary clause intended to cover incidental items, overlooked assets, and property acquired after the will's execution. Rather, it seems a reasonable interpretation that the clause was specifically intended to address the substantial number of items listed in the preceding paragraph and to bequeath them in a very specific way which deviated substantially from her desires recorded in 1978.

¶18. Because of the broad sweep of the 1992 writing, because it specifically mentions substantially all of the testatrix's assets, including specific listings of her personal property, and because the instrument then proceeds to make a disposition of the personalty in a manner markedly different from the 1978 writing, we have no difficulty in concluding that the chancellor did not abuse her discretion when she held that the 1992 writing revoked the testamentary dispositions contained in the 1978 writing by necessary implication. To that extent, we are satisfied that the chancellor did not commit reversible error.

¶19. That leaves us to face the question of whether the 1994 writing was, in its own right, such a total deviation from the 1992 instrument as to cause a corresponding complete revocation of it. The chancellor concluded that was not the case, and we do not find that to be an abuse of discretion. Though the 1994 writing begins with the same broad language as the 1992 instrument concerning the testatrix's "worldly goods," it is evident that the 1994 writing does not attempt to alter the provisions of what, for want of a better term, we have referred to as the 1992 writing's residuary clause. Because the evidence shows that there were substantial assets bequeathed under the 1992 residuary clause, having an apparent value in excess of $600,000, it is difficult to imagine that the testatrix, in changing the disposition of two particular assets but remaining silent as to a substantial part of her estate, intended to render herself intestate as to such a substantial part of her estate. Mississippi recognizes the doctrine of partial revocation of an instrument, the effect of which is to preserve those devises and bequests in an earlier testamentary instrument that are not specifically dealt with in a later instrument. *In re Will of Palmer v. Palmer,* 359 So. 2d 752, 754 (Miss. 1978).

¶20. In comparing the 1992 and 1994 writings, we are unable to conclude that the chancellor was manifestly in error when she found that the testatrix's intent in 1994 was to change the testamentary disposition of her homeplace and the Mississippi Industries for the Blind property, and to leave the remaining terms of the 1992 writing in effect. Further support for this conclusion is found in the fact that the testatrix preserved the 1992 writing in her possession after executing the 1994 writing and, in 1995, she added a further provision to her testamentary plan that was written on the same sheet of paper as the 1992 writing.

¶21. We, therefore, affirm the chancellor's opinion that the provisions of the 1994 writing inconsistent with the 1992 writing did not serve to revoke the 1992 writing in its entirety, but rather constituted only a partial revocation of two specific bequests made in the earlier instrument.

¶22. Our decision on this point renders Adams's third and fourth issues moot. In the third issue, Adams

argued that the revocation by necessary implication of the 1992 writing by an instrument that made no disposition of the personalty had the effect of reviving the 1978 writing. Since we have determined that the 1992 writing was not revoked by implication, there is no need to deal with this issue. Adams's fourth issue dealt with whether the 1995 writing appended to the 1992 writing constituted a republication of the 1992 will, that being one of the alternative arguments the appellees had made to the chancellor. Again, because we are affirming on the ground that there was never a complete revocation of the 1992 writing in its entirety, there is no need to address this issue.

¶23. Finally, Adams urges that the language of the 1995 addendum to the 1992 writing, if interpreted literally, results in the total disinheritance of the appellees. In particular, Adams points out the language to the effect that "[a]ny one of these heirs who cares to hire a lawyer to see that this will is executed forfeits his inheritance." Adams suggests that this language reinforces her position that the testatrix intended to completely revoke the 1992 writing in that it attached a substantial penalty to any heir who might, in the future, assert that the 1992 writing might yet have some validity.

¶24. The chancellor concluded that the actual intention of the testatrix in making that provision was so uncertain as to deprive it of any clear meaning that could be given effect in the probate proceeding. *Maupin v. Estate of Perry,* 396 So. 2d 613, 616 (Miss. 1981). The chancellor noted that the testatrix had, on two separate occasions, in her writings, mentioned the fact that she did not believe that a court proceeding or assistance from an attorney would be necessary to carry out the provisions of her testamentary dispositions. Thus, the chancellor felt that the clause could be read merely as an attempt to reemphasize the testatrix's apparent aversion to attorneys and probate courts in general, rather than as an effort to categorically communicate her desire to cancel the 1992 writing. Certainly, there is some logic in that interpretation since it would appear that, had the testatrix been so strongly of the persuasion that the 1992 writing was to have no effect, the most logical thing to do would have been to simply destroy the instrument in its entirety. There is the further problem that, if the provision is to be read and applied literally, it does not suggest that an heir would be disinherited for attempting to gain some advantage under the 1992 writing, but rather for hiring a lawyer to do so. Thus, on a literal reading, any heir could pursue such a course *pro se* without risking a forfeiture. That proposition seems nonsensical on its face but, by that fact, demonstrates the hazard of pushing for a literal reading of the entry. The chancellor is obligated to diligently pursue a course designed to uncover the testatrix's intent and give it effect even when that intent is not crystal clear. *In re Estate of Homburg v. Clark,* 697 So. 2d 1154 (¶11)(Miss. 1997). The fact remains that, on some occasions, the sought-after understanding of the testatrix's wishes simply cannot be accomplished. In those cases, the chancellor must give effect to those portions that are capable of being understood and must, perhaps reluctantly, abandon the attempt to divine meaning from language incapable of meaningful interpretation. That would appear to be the course followed by the chancellor in this instance and we do not find it to be in error.

¶25. Adams urges alternatively that the testator evidenced her intent to revoke the 1992 writing in its entirety in unequivocal terms by writing the word "void" on it three separate times, apparently in 1994 when she was drafting the second writing. It would appear that, at the same time these words were written onto the document, the testatrix had obliterated the paragraph dealing with disposition of the Mississippi Industries for the Blind property by scratching through it with a pen. The chancellor observed that the word "void" in every case was in close physical proximity to the obliterated paragraph and she concluded that the words "void" were meant to relate to that marked-through paragraph only and not to the entire instrument. Our inspection of the document persuades us of the same thing. That fact combined with the consideration

that the testatrix carefully preserved the 1992 document in her personal effects, even after she scratched through the devise relating to one particular parcel of real property, leads us to the conclusion that the chancellor's reasoning on this issue has merit. Therefore, we find no error in her determination that the words "void" referred only to the scratched-through paragraph devising the Mississippi Industries for the Blind property to A.P. Carney and not to the entire document. *See, e.g., In re Will of Palmer,* 359 So. 2d at 753.

¶26. Because we are unconvinced that the appellant has shown manifest error in the chancellor's interpretation of these various writings, we are of the opinion that the judgment of the chancellor must be affirmed.

¶27. **THE JUDGMENT OF THE CHANCERY COURT OF LAUDERDALE COUNTY IS AFFIRMED. THE COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT.**

**KING AND SOUTHWICK, P.JJ., BRIDGES, COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.**